RECORD NOS. 08-3037(L); 11-3032

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

In The

# United States Court of Appeals
## For The District of Columbia Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

**v.**

## GREGORY BELL,
**also known as Boy-Boy, also known as Bunga;**
## DAVID WILSON,
**also known as Cool Wop, also known as Cootie,**

*Defendants - Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

––––––––––––

**REPLY BRIEF OF APPELLANT DAVID WILSON
(TRIAL ISSUES)**

––––––––––––

Michael E. Lawlor
Sicilia C. Englert
LAWLOR & ENGLERT, LLC
6305 Ivy Lane, Suite 608
Greenbelt, Maryland 20770
(301) 474-3404

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATUTES AND REGULATIONS ....................................................1

SUMMARY OF ARGUMENT ...........................................................1

ARGUMENT .....................................................................................3

I.     FORCING GARY PROCTOR TO TAKE OVER AS LEAD COUNSEL VIOLATED WILSON'S RIGHT TO DUE PROCESS AND EFFECTIVE REPRESENTATION .........................3

II.    THE DISTRICT COURT ERRED IN ALLOWING THE GOVERNMENT TO PRESENT EVIDENCE OF TWO UNCHARGED MURDERS ...............................................13

     A.    Admitting the Reid Murder as Intrinsic Evidence Was an Abuse of Discretion ..................................................13

     B.    Admitting the Philips Murder Was an Abuse of Discretion ...........................................................17

     C.    Admission of the Reid and Phillips Murders Prejudiced Wilson .....................................................20

III.    THE GOVERNMENT'S *BRADY* VIOLATIONS WARRANTED A MISTRIAL ...............................................21

     A.    Carter's Statement Did Not Need to be Admissible to Constitute *Brady* Material ........................................21

     B.    The Carter Report Was Not Disclosed in Time For the Defense to Use It ...........................................24

i

C.    Evidence of Other Suspects in Doleman's Murder Would
       Have Undermined the Government's Theory that Wilson
       had a Motive to Kill Middleton ................................................28

CONCLUSION ...................................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Avery v. Alabama*,
    308 U.S. 444 (1940)..........................................................................5

*Brady v. Maryland*,
    373 U.S. 83 (1963)................................................... 2, 21, 22, 23, 24, 25, 26

*Burdine v. Johnson*,
    262 F.3d 336 (5th Cir. 2001) .......................................................10

*Carter v. Bennett*,
    840 F.2d 63 (D.C. Cir. 1988).......................................................11

*Carter v. District of Columbia*,
    795 F.2d 116 (D.C. Cir. 1986).....................................................20

*Chambers v. Maroney*,
    399 U.S. 42 (1970).........................................................................5

*DiSimone v. Phillips*,
    461 F.3d 181 (2d Cir. 2006) ...........................................23, 24, 25

*Hunt v. Lee*,
    291 F.3d 284 (4th Cir. 2002) .......................................................28

*Jamison v. Collins*,
    291 F.3d 380 (6th Cir. 2002) .......................................................24

*Leka v. Portuondo*,
    257 F.3d 89 (2d Cir. 2001) ..........................................................25

*Old Chief v. United States*,
    519 U.S. 172 (1997)................................................................ 19-20

*\*Chief Authorities are Designated by an Asterisk*

*Powell v. Alabama,
  287 U.S. 45 (1932)................................................................7, 9, 13

Tippins v. Walker,
  77 F.3d 682 (2d Cir. 1996) ..........................................................10

United States v. Adams,
  401 F.3d 886 (8th Cir. 2005) ........................................................14

United States v. Anderson,
  881 F.2d 1128 (D.C. Cir. 1989).....................................................11

United States v. Brown,
  597 F.3d 399 (D.C. Cir. 2010).......................................................20

*United States v. Cronic,
  466 U.S. 648 (1984).............................................................6, 7, 13

United States v. Derr,
  990 F.2d 1330 (D.C. Cir. 1993)...........................................21, 22, 23

*United States v. Foskey,
  636 F.2d 517 (D.C. Cir. 1980).......................................................20

United States v. Gonzalez-Lopez,
  548 U.S. 140 (2006)...................................................................12

*United States v. Hart,
  324 F.3d 740 (D.C. Cir. 2003).......................................................11

United States v. Javor,
  724 F.2d 831 (9th Cir. 1984) ........................................................10

United States v. Juan Bowie,
  232 F.3d 923 (D.C. Cir. 2000).......................................................14

*United States v. Lighty,
  616 F.3d 321 (4th Cir. 2010) ....................................................15, 16

*United States v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011)....................................................................11, 14

*United States v. Rogers*,
    918 F.2d 207 (D.C. Cir. 1990).........................................................................18

*Wright v. Van Patten*,
    552 U.S. 120 (2008).........................................................................................10

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ......................................................................................7, 13

U.S. Const. amend. VI.....................................................................................7, 13

## STATUTE

28 U.S.C. § 2254 ..................................................................................................10

## RULES

Fed. R. Evid. 403 .....................................................................................16, 17, 20

Fed. R. Evid. 404 .................................................................................................18

Fed. R. Evid. 404(b).....................................................................2, 16, 17, 18, 20

## STATUTES AND REGULATIONS

All relevant statutes and regulations are set forth in the opening brief.

## SUMMARY OF ARGUMENT

David Wilson was one of the lead defendants in a 58-count indictment that alleged a violent cocaine conspiracy spanning 13 years. Trial preparation involved a dizzying amount of discovery, witness interviews, and investigation. The trial would last approximately nine months. It was not a case that any lawyer could pick up at the last minute and defend effectively. Yet that is what the district court expected.

On the eve of trial, one of Wilson's two appointed lawyers conflicted out of the case. The district court appointed Gary Proctor to assist Wilson's remaining counsel, Jenifer Wicks. Proctor remained very much in the role of an assistant until Wicks fell ill after four months of trial. Proctor was made to take over as lead counsel despite his strenuous protestations that he had missed one-third of the trial and his role had only been to assist Wicks in this large-scale case. The district court's refusal to grant a mistrial under these circumstances constitutes structural error that deprived Wilson of his right to due process and effective assistance of counsel.

The district court erred in admitting an uncharged murder as intrinsic evidence when the government failed to show how the murder was connected to any of the

1

charged crimes. The district erred in admitting a second murder under Fed. R. Evid. 404(b) to show Wilson's access to and familiarity with guns. This was error because there was abundant other evidence of the same fact. Both of the uncharged murders were highly prejudicial–especially as to Wilson's convictions for murdering Ronnie Middleton and Sabrina Bradley.

The government incorrectly argues that *Brady* information must be admissible; it is material as long as information derived from it is admissible. And contrary to the government's assertion, Wilson did not receive the late-disclosed Bradley Carter report in time to use it. The government is also incorrect in arguing that the undisclosed alternative suspects to the Maurice Doleman murder was not favorable or material. Evidence of other suspects would have contradicted the government's theory that Wilson had a motive to kill Ronnie Middleton. Because of the late disclosures, Wilson was unable to investigate and make use of the information.

It is noteworthy that the jury found the other defendants guilty of only a few drug distributions. Four of the six co-defendants were charged with murders and serious assaults and all except Wilson were not found guilty. The jury disbelieved the vast majority of the government's witnesses–even delivering a "not guilty" verdict in the murder of Trevon Shaw for which the government had presented an eyewitness to the shooting. By contrast, there was no eyewitness in the Middleton/Bradley shooting and no physical evidence connected to Wilson. The government relied on

2

presenting a motive and purported confessions.  Reflecting the weakness of the government's case, the jury initially sent a note stating that it was unable to render a verdict on the Middle/Bradley murders.  It is likely that absent the aforementioned errors, Wilson would not have been convicted.

## ARGUMENT

## I.  FORCING GARY PROCTOR TO TAKE OVER AS LEAD COUNSEL VIOLATED WILSON'S RIGHT TO DUE PROCESS AND EFFECTIVE REPRESENTATION

Wilson's defense was handicapped long before Jenifer Wicks became ill.  Katkish and Wicks represented Wilson for nearly two years.  Just three weeks before trial, Katkish conflicted out of the case and the district court denied Wicks' request for a continuance.  Tr. 1/23/07, 5; (Dkt. 697, 717).[1]  J.A. 2138, 681, 693.  Suddenly taking over as lead counsel, Wicks scrambled to find someone who could assist her on short notice with a nine-month trial.

Gary Proctor was admitted to practice before the district court *pro hac vice* ten days before trial.  (Dkt. 711, J.A. 107).  As to his selection by Wicks, Proctor explained:

> I have never done a case with her before.  I met her maybe twice at conferences.  I think she couldn't find another sucker that would step up

---

[1]  "Tr." denotes Transcript followed by the date of the proceeding and page number; "Dkt" refers to the district court docket followed by the document number.

3

> 11 days before trial.  She didn't pick me because she thought I was the
> best person for the job.  I suspect I was the only person for the job.

Tr. 6/25/07, 16548-49; J.A. 3378.  Under the circumstances, there was no expectation that Proctor would be a full partner in Wilson's defense.  Proctor accepted the appointment with the understanding that he could maintain his existing caseload and assist Wicks primarily behind the scenes.  (Dkt. 1016 p. 3; J.A. 729).  He was away for significant periods, tending to his own cases, attending his grandmother's funeral in Ireland, and performing tasks outside the courtroom for Wicks such as research, drafting motions, and photocopying documents.  (Dkt. 1016 p. 3; J.A. 729).

This was not a case in which Proctor could quickly bring himself up to speed. In a trial expected to last nine-months, Wilson was charged in 23 counts, including conspiracy, racketeering conspiracy, three murders, numerous violent offenses in aid racketeering, numerous drug distributions and related counts. Because it was a complex case, the court had authorized two counsel for each defendant charged with death-eligible crimes.  Tr. 11/6/06, 6; J.A. 2122.  Co-defendants Antwuan Ball and Dominic Samuels each had two experienced counsel working on the case from the start.  But in Wilson's camp,  Katkish dropped out shortly before trial and was replaced by Proctor, who knew nothing about the case and who had little federal trial experience.  (Dkt. 1016, p. 2, 4; J.A. 728, 730).  The trial transcripts are telling about Proctor's role.  Of the government's 87 witnesses presented before Wicks' illness,

Proctor cross-examined only one significant witness. Tr. 5/29/07 AM, 13142-13169;

J.A. 3047. When Wicks became ill after four months of trial, the district court

initially granted Wilson's motion to sever his case:

> [F]or Mr. Wilson to be able to effectively mount, not just a defense to
> the remainder of the Government's case, but to also be able to carry
> forward with the conceptualization of the proper affirmative defense to
> put on in the defense case . . . Ms. Wicks' absence . . . would frankly be
> crippling to Defendant Wilson's ability to proceed at this point.

Tr. 6/25/07AM, 16564-66; J.A. 3382. The government objected. Weighed down by

the prospect of a three-month retrial and tempted by the notion that more time could

cure any defects, the court reversed.[2] Tr. 6/27/07AM/PM, 46-48; J.A. 3402.

The district court and the government misperceived the problem as a matter

that could be resolved merely by giving Wilson more time. The government cites

*Avery v. Alabama*, 308 U.S. 444 (1940), and *Chambers v. Maroney*, 399 U.S. 42, 54

(1970), for the proposition that a short time to prepare for trial, standing alone, does

not *per se* constitute denial of counsel. Government's Response Brief on Trial Issues

(hereafter cited as "GB" 21-22).

---

[2] Given the acquittals on conspiracy, racketeering, and other counts, a re-trial
of the Middleton/Bradley murders and cocaine convictions would be far less onerous.

5

But Wilson never argued that he merely needed more time to prepare.[3] None of the cases cited by the government address the unique circumstances of his appointment and the fact that Proctor was absent for one-third of the trial. Perhaps more time could have been sufficient under different circumstances–for example, if Katkish had stayed in the trial and Wicks became ill; or if Proctor rather than Wicks became ill. But Wilson, handicapped from the start of the trial, had no effective defense without Wicks regardless of the amount of time given to Proctor.

The government relies on *United States v. Cronic*, 466 U.S. 648 (1984), where newly appointed counsel requested a continuance to allow him 30 days to prepare for a mail fraud case. The trial court granted a two-week continuance giving counsel 25 days to prepare for a four-day trial. *Id.* at 663. The Supreme Court noted that the charges were not complicated and most of the government's case consisted of establishing undisputed transactions. *Id.* at 665. The only disputed issue was intent. *Id.*

---

[3] The Government states that Mr. Proctor "acknowledged, however, that 'with an adequate recess,' an experienced attorney could continue representation 'and justice would be served and effective assistance would continue.'" GB 14 (citing TR 16549); J.A. 3378. To be clear, Proctor was referring to co-defendants, Ball and Samuels who each had two experienced counsel from the start. Tr. 6/25/07AM, 16549; J.A. 3378. Proctor argued that in contrast, a continuance would not be sufficient in Wilson's case because he lacked experience in federal cases, he was appointed too late, and missed too much of the trial. *Id.*

While holding that it was not appropriate to presume ineffective counsel in that case, the *Cronic* Court reaffirmed that "*Powell* [*v. Alabama*, 287 U.S. 45 (1932)] was thus a case in which the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance that ineffectiveness was properly presumed without inquiry into actual performance at trial." *Id.* at 661.[4]

Wilson's complaint is not that Proctor merely needed more time to prepare after Wicks became ill; Wilson's argument is that an effective defense was impossible without Wicks. This is true for several reasons.

First–a lawyer's expectations as to his role in the case is significant. In *Powell*, the trial court appointed "all members of the bar" to represent defendants charged with rape. *Id.* 287 U.S. at 49. The Supreme Court found that, "such designation of counsel as was attempted was either so indefinite or so close upon trial as to amount to a denial of effective and substantial aid in that regard." *Id.* at 53. The Court noted that the appointment imposed no definite obligation on anyone and that members of the bar likely expected other counsel to appear for the defendants before trial. *Id.* at 56-57.

---

[4] The *Powell* Court based its decision on the right to due process. *Id.*, 287 U.S. at 71. Accordingly, Wilson raises this issue pursuant to the Fifth Amendment right to due process issue as well as the Sixth Amendment right to effective counsel.

7

Here, Wicks needed help with a nine-month trial on an emergency basis.

Proctor did what Wicks directed him to do and, given his last minute appointment and

the complexity of the case, reasonably did not attempt to educate himself on all

aspects of the case.  That Proctor was unprepared to step into the role of lead counsel

is apparent.  As to defending Wilson for the remainder of the government's case,

Proctor protested:

> Ms. Wicks had worked up the cross-examination, is privy to the
> records . . . Ms. Wicks was supposed to do it. . . . when I read them
> [daily transcripts], I didn't read them with a view to cross-examining
> them. . . . I was reading for informational purposes rather than I would
> have to weave them into a closing argument because Ms. Wicks was
> supposed to deliver the closing argument.

Tr. 6/25/07, 16551-52; J.A. 3379.  Proctor was equally at a loss when it came to the

defense case:

> I'm guessing Ms. Wicks sent me a list of possible defense witnesses.  I
> believe there were 35 to 40 names on it, of which maybe 10 I even
> recognized.  I don't know who the other 25 are.  I don't know what
> they've got to say.  I don't know if they have Fifth Amendment
> concerns.

*Id*. Although Proctor had been in the case for four months, and read the transcripts for

the days he had missed, he had not read them with the interested

attention of crafting a defense.[5] In *Powell*, appointment of all members of the bar

failed to convey the responsibility of conducting a defense on behalf of any of the

defendants. Here, Proctor reasonably did not expect that he would have to take charge

of Wilson's defense and was unprepared to do so.

Second–no amount of time could make up for Proctor's missed trial days. The

defense case is a work in progress formed while observing the prosecution's case.

A trial attorney must constantly assess each piece of the government's case; observe

how it is received by the jury; assess how it fits into the larger picture of the trial; and,

having reviewed the discovery and interviewed the witnesses, choose what evidence

to present in the defense case. Thus it is only after the government rests that the

defense decides whether the defendant will testify, or whether there will be a defense

case at all. The defense is crafted from judgments about each piece of the

government's case and judgments about the costs and benefits of presenting each

piece of evidence available to the defense. Effective assistance requires counsel to

exercise judgment for the client's benefit. As discussed in Wilson's opening brief at

36-37, structural error has been found in cases where counsel slept through portions

---

[5] To the extent the government implies that Wicks was available by telephone, GB 18-19, this should be put in context. Proctor and newly appointed counsel, Matthew Davies, were at a loss when asked to estimate the length of the defense case. The district court then suggested that they call Wicks for the limited purpose of getting a projection. Tr. 7/17/07, 18652-53; J.A. 3416-17.

of the trial and was unable to exercise judgment on the client's behalf.  *See Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001); *Tippins v. Walker*, 77 F.3d 682 (2d Cir. 1996); *United States v. Javor*, 724 F.2d 831 (9th Cir. 1984).

The government's reliance on *Wright v. Van Patten*, 552 U.S. 120 (2008), does little to advance its argument.  *Wright* is a state habeas case brought under 28 U.S.C. § 2254, which bars relief in federal court unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  *Id.* at 123 (quoting 28 U.S.C. § 2254).  In that case, counsel was not physically present for the defendant's plea hearing but was linked by speaker phone.  The Court held that there was no Supreme Court precedent clearly holding that counsel's participation by speaker phone at a plea hearing should be treated as a complete denial of counsel.  Therefore, federal habeas relief was not authorized by statute.  *Id.* at 125-26.  The Court made clear that, "our own consideration of the merits of telephone practice, however, is for another day, and this case turns on the recognition that no clearly established law contrary to the state court's conclusion justifies collateral relief."  *Id.* at 126.

The government also argues that, "[s]imply because reviewing transcripts may not be the same as 'observing witnesses as they testify' or 'observing how the jury received the evidence' is not the question before the Court."  GB 25 (quoting

10

Appellant's Opening Brief at 34-35).  Appellant disagrees.  This question is squarely before the court.

Reading a transcript is an inadequate substitute for watching and hearing the government's evidence.  For this reason, appellate courts are loath to overturn trial court decisions based on credibility determinations.  *See*, *e.g.*, *United States v. Hart*, 324 F.3d 740, 747 (D.C. Cir. 2003) ("it is well-settled that 'the district court's credibility determinations are entitled to the greatest deference from this court on appeal'"); *Carter v. Bennett*, 840 F.2d 63, 67 (D.C. Cir. 1988) (same); *United States v. Anderson*, 881 F.2d 1128, 1142 (D.C. Cir. 1989) ("credibility determinations … are not for us to second guess"); *United States v. Moore*, 651 F.3d 30, 41 (D.C. Cir. 2011) (deferring to trial court in reviewing a *Batson* challenge because the trial court had the opportunity to review both the demeanor of the prosecutor and the prospective juror).

The government argues that Proctor performed well because he presented eight defense witnesses, GB 23, and Wilson was acquitted of a number of counts.  GB 26.  Wilson maintains that this is a case of structural error.  Nevertheless, the government fails to address in this context Proctor's failure to call Bradley Carter, who told police that Michael Smith (Teeny Man) said that Aman Ball and Joseph Jones were the shooters (not Draine and Roberson as claimed by the government).  *See infra*, Part III.  Wicks had stated in open court her intention to recall him in the defense case.  Tr.

11

5/31/07AM, 13641-42; J.A. 3206-07.  Proctor also did not question Officer Giannakoulias, who took the statement from Carter.  This would have been an easy matter since Giannakoulias was called as a witness by co-defendant Ball.  Tr. 8/22/07PM, 19183; J.A. 3433.

The fact that Wilson was acquitted of some charges does not show that he received effective assistance of counsel, *see* GB 26.  Other defendants were charged with Wilson in many of the counts such as conspiracy, racketeering, and the Trevon Shaw murder.  Those acquittals could be attributed as much to the efforts of  co-defendants' counsel.  And acquittals also may have occurred because the government simply failed to prove its case.

The government misapprehends Wilson's references to *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006).  GB 10 n. 5 (citing Wilson's Opening Brief on Trial Issues p. 33, 35-36) and GB 27 n. 13 (citing Wilson's Opening Brief on Trial Issues p. 40).  Wilson did not claim any right to choice of counsel.  Rather, Wilson cited *Gonzalez-Lopez* for the proposition that his case–like other cases in which the Supreme Court has found structure error–involved "consequences that are necessarily unquantifiable and indeterminate."  *Id.* at 150.  Here, the consequences of representation by relay is unquantifiable and indeterminate.  Had the district court declared a mistrial, Wilson, being indigent, would not have had the right to insist that Wicks represent him in a retrial.  But he would have had the benefit of new counsel

12

representing him from beginning to end who would exercise judgment on his behalf in a coherent defense strategy.

The *Powell* Court found that the circumstances of appointment and representation in that case violated the defendants' right to due process. The *Cronic* Court recognized that those circumstances also violated the right to assistance of counsel such that ineffective assistance of counsel should be presumed. Forcing Proctor to take over under the circumstances of this case deprived Wilson of his Fifth Amendment right to due process and his Sixth Amendment right to effective assistance of counsel.

## II.  THE DISTRICT COURT ERRED IN ALLOWING THE GOVERNMENT TO PRESENT EVIDENCE OF TWO UNCHARGED MURDERS

### A.  Admitting the Reid Murder as Intrinsic Evidence Was an Abuse of Discretion

As an initial matter, the government incorrectly argues that Wilson failed to object to admission of the Reginald Reid murder. GB 34, 43. Wilson submitted written motions prior to and during trial to exclude the evidence. (Dkt. 621, 756; J.A. 671, 694). Wilson's supplemental opposition (Dkt. 621; J.A. 671) specifically objects to the Reid homicide. In the same document, Wilson moved to join co-defendant Antwan Ball's "Memorandum in Reply to Government's Supplemental Notice and Motion to Admit Evidence of Other Crimes." (Dkt. 616; J.A. 666). Ball's

13

memorandum encompasses all of the other crimes evidence the government sought to introduce.  The government's argument that Wilson's motion (Dkt. 756; J.A. 694) is limited only to *additional* undisclosed evidence, GB 34 n.17, is  unsupported. Wilson's motion is entitled "Motion to Exclude Any Evidence 'Intrinsic' to the Charged Criminal Acts." The content of the motion is devoted to excluding the Reid and Phillips murders.  Wilson disagrees that any argument was waived or that the plain error standard applies.

The government contends that the Reid murder was intrinsic to the conspiracy because it showed the development of the relationship between the alleged co-conspirators, GB 44; it was committed to enrich members of the alleged conspiracy and to weaken another drug dealer, GB 45; and it showed mutual trust between the participants, GB 46.

The Reid murder was not intrinsic to any of the charged crimes.  It was not "part of the charged offense" nor did it "facilitate the commission of the charged crime.'" *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (quoting *United States v. Juan Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).  The government can only make  vague allegations that it was related to the alleged conspiracy.  Yet there is a limit even in conspiracy cases.  *See Moore*, *id.*, (holding, in a conspiracy case, that the district court likely erred in admitting defendants' roles in other conspiracies); *cf. United States v. Adams*, 401 F.3d 886, 899 (8th Cir. 2005) (noting that when it is

14

difficult to distinguish between the charged crime and other wrongful acts, the intrinsic-extrinsic framework loses its significance).

The government's most specific claim, that the Reid murder "was committed in an effort to enrich certain members of the organization, as well as weaken another drug dealer" GB 45, is belied by the government's own evidence. After the failed attempt to take anything of material value, Wilson and Capies allegedly blamed someone else for the murder and tried to get Cedric Connor to pay them to kill Reid's purported murderer. Tr. 4/2/07AM, 5266-68; J.A. 2607. This showed they were merely scheming to get Connor's money for themselves rather than trying to weaken him to benefit any conspiracy. The district court should have required adequate evidence connecting the murder to one of the charged offenses before admitting it as intrinsic evidence.

In *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010), Kenneth Lighty and James Flood were charged with kidnapping conspiracy, kidnapping resulting in the death of Eric Hayes, and related offenses. The government introduced evidence that a month later, the two defendants were involved in another altercation resulting in Lighty killing another man (Afton Street shooting). *Id.* at 341. The Court of Appeals for the Fourth Circuit held that:

> There was simply no connection between the Afton Street Shooting and
> the Hayes kidnapping and murder; the events occurred at different times,

15

> at different places, and involved completely different motives, so there
> were no gaps in the government's case without the evidence.

*Id.* at 354.  In the instant case, there were no gaps in the government's case that

necessitated evidence of the Reid murder.

As to the vague assertions that the Reid murder was intrinsic to the alleged

conspiracy because it showed the development of the relationship between the co-

conspirators and mutual trust, there was nothing unique about the Reid murder that

revealed any aspect of the participants' relationships that was not already covered by

other evidence.  Capies testified extensively about drugs, his relationship among and

between the co-defendants, "beefs" between drug dealers, and acts of violence.  *See*,

*e.g.*, Tr. 3/27/07 PM, 3/29/07, 4/2/07, 4/3/07.  For example, Capies testified that he

participated in numerous robberies with Wilson and Thurston.  Tr. 4/3/07AM, 5391-

92; J.A. 2618.  The Reid murder was superfluous for the purpose of showing any

relationship or  mutual trust between Capies, Thurston, and Wilson.  *See Lighty*, 616

F.3d at 354 (stating that "as the quantum of other non-Rule 404(b) evidence available

to prove an issue unrelated to character increases, the need for the Rule 404(b)

evidence decreases").  Had the district court properly rejected the government's

intrinsic argument, it would have analyzed the evidence under Rule 404(b) for

admission of other crimes, and the additional balancing test under Rule 403.

**B.    Admitting the Philips Murder Was an Abuse of Discretion**

The government incorrectly argues that Wilson waived his objection to the Phillips murder. GB 37. To the contrary, Wilson consistently fought to exclude the murder. *See* Dkt. 573, 621, 756; J.A. 662, 671, 694. The district court had suggested that perhaps the jury need not be informed that Phillips died of the shooting. *See* Tr. 1/22/07, 80, 97; J.A. 2127, 2135. It was only after the court had ruled the shooting admissible that Wicks argued it could not be sanitized–so that she could cross-examine Larry Brown on the fact that he supplied the gun for a murder and had a strong incentive to curry favor with the government. Tr. 2/28/07PM, 1001; J.A. 2318. Certainly Wicks did not argue for admission of the shooting. The government mischaracterizes Wicks' argument as invited error and asserts a plain error analysis that is not applicable. GB 37-38.

As another preliminary matter, the district court incorrectly found that the probative value of the Phillips shooting was not *substantially* outweighed by the danger of undue prejudice. The word "substantially" imposes a higher showing of prejudice and is notably absent from the advisory committee notes to Rule 404(b). The term "substantially" is found only in Rule 403–for excluding relevant evidence. It is fitting that there should be a lower burden of prejudice for admission of other

17

crimes under Rule 404(b).  This Court has followed as authoritative, the advisory

committee note to Rule 404(b):

> [T]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions under Rule 403.

*United States v. Rogers*, 918 F.2d 207, 209-10 (D.C. Cir. 1990) (quoting Fed. R.

Evid. 404 advisory committee note).

Regardless, under either standard, the danger of undue prejudice far

outweighed the probative value of the evidence.  The government argues that the

Phillips murder was relevant to show Wilson's familiarity with and access to firearms,

GB 38, and his relationship of trust with Larry Brown.  GB 39.  The advisory

committee notes to Rule 404(b) state that the balancing test must be conducted "in

view of the availability of other means of proof."  Wilson's Opening Brief on Trial

Issues, pp. 47-49, summarizes the abundant other evidence of  Wilson's familiarity

with and access to guns.  By the same token, the Phillips murder was certainly

unnecessary to show Wilson's relationship to Brown.  Other than testifying about the

Phillips murder, Brown's primary role in the government's case was to testify about

drug transactions.  The testimony about those interactions was sufficient to establish

any relevant trust relationship without having to present the details of a murder.

18

The government complains that at the time the district court made its ruling, it did not have the benefit of all the testimony showing Wilson's familiarity with and access to guns. GB 40.  But the indictment details many allegations of gun use by Wilson.  (Dkt. 544; J.A. 593).  In Count One, Part D, the government details overt acts of the conspiracy to include:

(¶2)    [I]n or around the 1400 block of Congress Place, SE . . . Wilson . . . while armed with a firearm, assaulted James Faison . . .

(¶3)    [I]n or around Robinson Place, SE . . . Wilson . . .while armed with a firearm, assaulted James Faison . . .

(¶5)    [I]n or around Congress Place and Stanton Road, SE . . Wilson . . . while armed with a firearm, assaulted James Faison . . .

(¶33)  . . . Ball sold to a co-conspirator not indicted herein the Ruger .9mm semi-automatic pistol that he had taken from Wilson . . .

(¶61) . . . Wilson . . . while armed with a firearm, assaulted Quentin Milstead . . .

(¶83)  . . . Wilson . . . while armed with firearms, shot and killed Trevon Shaw . . .

(Dkt. 544, p. 6-21; J.A. 598-613).  Count Two (Racketeering) further details acts of violence involving firearms.  *Id.* at 32-39; J.A. 624-31.  At the time of the district court's ruling, the indictment alone showed that there was ample evidence of Wilson's familiarity with and access to guns without introducing the Phillips murder. The district court's admission of the murder in light of the other abundant evidence of the same fact, was an abuse of discretion.  *See Old Chief v. United States*, 519 U.S.

19

172, 185 (1997) (stating that the probative value of evidence is affected by other evidence on the same point); *Carter v. District of Columbia*, 795 F.2d 116, 132 (D.C. Cir. 1986) (holding that the District Court abused its discretion by failing to take into account the availability of other means of proof); *United States v. Brown*, 597 F.3d 399, 406 (D.C. Cir. 2010) (noting that availability of alternatives is a factor); *United States v. Foskey*, 636 F.2d 517 (D.C. Cir. 1980) (holding that evidence should have been excluded because the minimal relevance was substantially outweighed by the danger of unfair prejudice).

### C. Admission of the Reid and Phillips Murders Prejudiced Wilson

The government argues that the Reid and Phillips murders would not have changed the jury's perception of Wilson because they "learned of a host of violent acts by appellant." GB 41. The fact that Wilson was alleged to have been involved in other violent acts does not allow the court to dispense with the balancing requirements of Rule 404(b) and Rule 403. Undoubtedly, the two shootings had a prejudicial effect. The jury may have decided that if Wilson was alleged to have been involved in so many murders, he likely committed the charged murders. This is inadmissible propensity evidence. *See Foskey*, 636 F.2d at 523 (stating that "a defendant must be tried for what he did, not for who he is") (citation omitted).

### III.   THE GOVERNMENT'S *BRADY* VIOLATIONS WARRANTED A MISTRIAL

#### A.   Carter's Statement Did Not Need to be Admissible to Constitute *Brady* Material

The government consistently presented to the jury its theory that Wilson drove Antonio Roberson (LT) and Antoine Draine to Middleton's truck, where LT and Draine shot and killed Middleton and Bradley.  Michael Smith, who was also in the truck, escaped injury and jumped out of the back of the truck.  Tr. 3/29/07PM, 5112-15; Tr. 4/2/07AM, 5138-44; J.A. 2576, 2586-87  (Capies testimony); Tr. 5/8/07PM, 10459-60; J.A. 2884-85 (Kellibrew testimony); Tr. 6/12/07PM, 15117-18; J.A. 3313-14 (Toran Scott Testimony).

After three months of trial, the government disclosed a police report stating that Smith, the only surviving eyewitness, had identified two different men–Aman Sahlee Ball and Joseph Jones–as the shooters–and did not name Wilson.  This is the evidence that the government characterizes as "small potatoes for the defense."  GB 66 (quoting *United States v. Derr*, 990 F.2d 1330, 1336 (D.C. Cir. 1993)).

First, the government complains that the police report is inadmissible, GB 61-62, and that Appellant failed to undertake an investigation after receiving the report, GB 62 n30.  But neither is a requirement under *Brady*'s materiality prong.  The report memorialized a police interview of Bradley Carter, who recounted Smith's statement.

21

To be sure, the report is hearsay within hearsay. However, the report itself need not be admissible. As the government acknowledges, "'to be 'material' under *Brady*, [the] undisclosed information *or evidence acquired through that information* must be admissible.'" GB 61 (quoting *United States v. Derr*, 990 F.2d 1330, 1336 (D.C. Cir. 1993)) (emphasis added).

Certainly, evidence of different shooters would have been admissible. And just because the statement is hearsay does not make it immaterial; such a rule would allow the government to withhold volumes of exculpatory evidence. The government's discovery obligation is not so limited.

The government mistakenly extends *Derr*, *supra*, to argue generally that inadmissible evidence is not material. GB 61-62. In *Derr*, the hearsay statement itself was inadmissible and defense counsel argued only that it would have been a source of further impeachment to undermine a witness's testimony. *Derr*, 990 F.2d at 1336. This Court noted that the witness had already been cross-examined and impeached on the same bias and the undisclosed statement would not have changed the jury's assessment of her credibility. Importantly, the court found that the statement had no impact on the physical evidence pointing to the defendant's guilt. *Id.*

Wilson is in a far different position. Wicks proffered that if the report had been timely disclosed, she would have conducted an extensive investigation, potentially

22

changing the defense theory of the case. In contrast to *Derr*, there was no physical evidence against Wilson in the Bradley and Middleton murders. The government relied on the testimony of witnesses who repeated what they allegedly heard from others, but not one witness saw the shooting. Every witnesses who testified for the government in the Middleton/Bradley murders was heavily impeached.

The hearsay nature of the undisclosed evidence is not a bar to a *Brady* claim. In *DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006), The Court of Appeals for the Second Circuit held that a statement was material exculpatory evidence even though it was inadmissible hearsay. There, Anthony DiSimone was convicted of stabbing someone to death during a street brawl. The medical examiner opined that each of the victim's thirteen wounds contributed to his death. *Id.* at 186. Near the end of the prosecution's case, the state revealed that an officer took a statement from Luvic Gjonaj who, though not present at the stabbing, heard Nickoun Djonovic say that he (Djonovic) stabbed the victim twice, then DiSimone stabbed the victim several more times. *Id.* at 192-93. Djonovic himself could not be found. *Id.* at 193.

The Court held, "[i]n a case in which not a single witness actually saw DiSimone stab the victim, evidence that another person had confessed to the stabbing was unmistakably exculpatory." *Id.* at 195. The Court did not require the defense to show that the statement itself was admissible. It noted that knowledge of the hearsay statement would have induced the defense to conduct further investigations, *id.* at

23

197, but it did not require the defense to actually conduct and produce results of an investigation as a prerequisite to pursuing a *Brady* claim. *See also Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002) (granting habeas corpus relief because suppression of a positive identification of different suspects disadvantaged the defense).

**B.     The Carter Report Was Not Disclosed in Time For the Defense to Use It**

The government next argues that the report was disclosed in time for Wilson to use it because Carter had not testified and other witnesses could have been recalled; the report was only two paragraphs long; and it contradicted the defense theory that Draine and LT did the shooting without Wilson.  GB 63-65.

It is disingenuous to suggest that defense counsel could easily digest the mere two-paragraph report and adjust the defense strategy.  It was not a question of the time required to read two paragraphs.  The information within those two paragraphs dropped a bombshell on the defense that put the case in an entirely different light. Wicks argued that it would be impossible during trial to investigate the new information (Dkt. 947 p. 6; Dkt. 957 p. 5; J.A. 704, 725).  And if she had known about the statement, she would have incorporated it into the defense theory and referenced it in opening statements; but after months of trial, it would be implausible to weave it into a coherent defense strategy.  (Dkt. 957 p. 2, 5; J.A. 722, 725).

24

The defense investigation was time consuming, arduous, and made more difficult because witnesses were scattered geographically, some were incarcerated, and some had counsel with whom to coordinate. (Dkt. 947 p. 2, Dkt. 947 p. 6-7; J.A. 700, 704-05). Counsel would have investigated the whereabouts of Jones and Ball on the night of the shooting and whether members of the Edelin group had conflicts with Ball and Jones. (Dkt. 947 p. 6-7; J.A. 704-05). It was simply not feasible to conduct an investigation during trial. *Id.*

As recognized in *DiSimone*, "[t]he opportunity for use under *Brady*, is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought. . . . And a responsible lawyer in the midst of the pressures and paranoias of trial may well deploy scarce trial resources doing other things." *DiSimone*, 461 F.3d at 197 (quoting *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001)). Here, after three months of trial, Wilson could not simply change his theory of the case.

The district court, as does the government on appeal, posited that Wilson had the opportunity to question Carter; could have recalled Capies and Kellibrew; and could have questioned officer Giannakoulias about the report. But the defense would have been foolish to change course without investigating the new information. In the midst of trial, the defense could not conduct the extensive investigation needed to make use of the disclosure.

25

The defense was stymied even when it made cautious attempts to use the information during trial. When cross-examining Patrice Johnson, who had spoken to Smith right after the shooting, the government objected when Wicks attempted to question her about whether or not Smith had identified the shooters. The court sustained the objection and held, "without more of a basis for believing that this witness indeed can corroborate the *Brady* that you might want to get out, I think it's just too unfair to Jo-Jo [Joseph Jones] at this point." Tr. 6/7/07AM, 14608-13; J.A. 3274-75.

Carter was called in the government's case to testify about a different shooting. Tr. 5/30/07AM, 13452-54; J.A. 3057. On cross-examination, Wicks attempted to question Carter about the statement he gave to Giannakoulias regarding the Middleton/Bradley shootings. Tr. 5/31/07AM, 13640; J.A. 3205-06. The government objected on the ground that it was beyond the scope of direct examination and the district court sustained the objection. Tr. 5/31/07AM, 13641; J.A. 3206.

The problem was heightened when Wicks became ill and Proctor was forced to become lead counsel. At the time she was prohibited from cross-examining Carter about his statement to Giannakoulias, Wicks made clear her intention to recall Carter:

26

"I don't want this witness released from the subpoena, because, for many different reasons, I plan on recalling him in my case." Tr. 5/31/07AM, 13641-42; J.A. 3206-07.

Wicks became ill before the defense case began. Proctor, protesting that he could not competently defend Wilson, was forced to take over. It is possible that Wicks would have questioned Carter, Capies, Kellibrew, and Giannakoulias about the report. But she became ill and Proctor did not call these witnesses. Now the government argues that the defense could have, but did not, call these witnesses. This, however, is simply evidence that Proctor was ill-prepared to take over the defense.

Finally, the government argues that the information in the Giannakoulias report was unhelpful because it contradicted defense witness Melvin Givens, who testified that he saw Roberson and Draine shoot Middleton's truck and that Wilson was not with them. This merely highlights Wicks' argument that the information was not given to the defense in time to weave it into a coherent defense strategy. If the report had been disclosed in a timely manner, the defense could have made an informed decision and perhaps Givens would not have been called as a defense witness.

27

**C.    Evidence of Other Suspects in Doleman's Murder Would Have Undermined the Government's Theory that Wilson had a Motive to Kill Middleton.**

In Wilson's trial, the government argued that Wilson wanted to kill Middleton to avenge Doleman's death.  After trial, the defense discovered police interview reports identifying three suspects other than Middleton in Doleman's murder.  One report stated that Antwuan Ball might have thought Maurice Willis killed Doleman, but the word on the street was that Calvin Smith killed Doleman.  (Dkt. 1233-4; J.A. 1657-59).  Another report implicated Antwanne Johnson as the murderer while a third report indicated that at person named Shawn shot Doleman.  *Id.*

The government argues that the police reports naming three alternative suspects in Doleman's murder were not favorable or material because they say nothing about who Wilson believed killed Doleman.  GB 66-67.

The government relies on *Hunt v. Lee*, 291 F.3d 284 (4th Cir. 2002), for the proposition that evidence undermining the defendant's motivation to kill is irrelevant so long as the defendant believed he had a motivation to kill.  At the outset, *Hunt* was a state prosecution reviewed by federal court under a much more stringent habeas standard.  *Id.* at 289.  Significantly, the *Hunt* Court found that the undisclosed police report was irrelevant to the defendant's belief that the victim implicated the defendant to police and therefore the defendant had a motivation to kill him.

28

Here, the reports need not say anything directly about Wilson's beliefs to be material to his defense. The government presented little or no credible evidence that Wilson held Middleton responsible for Doleman's murder. The fact that at least three other people were reported to police as suspects in Doleman's murder undermines the government's theory that Wilson believed Middleton killed Doleman. This is particularly so because one report indicates that Antwuan Ball thought that Maurice Willis killed Doleman. (Dkt. 1233-4; J.A. 1657-59). Given the government's theory that Ball was the leader of the alleged conspiracy, the jury could have presumed that Wilson shared Ball's knowledge. The report also said that the word on the street was that Calvin Smith killed Doleman. This made it less likely that Wilson believed Middleton was Doleman's killer. At a minimum, the reports pointing to three other suspects shows that it was unclear who killed Doleman and therefore it was unclear that Wilson believed Middleton was the killer.

29

## CONCLUSION

For the foregoing reasons, and those argued the Opening Brief, Mr. Wilson requests that this Court reverse his convictions and sentences and remand his case to the District Court.

Respectfully Submitted,

/s/ Michael E. Lawlor
Michael E. Lawlor
Sicilia C. Englert
Lawlor & Englert, LLC
6305 Ivy Lane, Suite 608
Greenbelt, MD 20770
301.474.3404

Appointed Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*6,839*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Corel WordPerfect 12*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>June 30, 2014</u>          <u>/s/ Sicilia C. Englert</u>
                                     *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 30th day of June, 2014, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Elizabeth H. Danello
> Stratton C. Strand
> U.S. ATTORNEY'S OFFICE
> (USA) Appellate Division
> 555 4th Street, NW, Room 8104
> Washington, DC  20530
> (202) 514-7088
>
> *Counsel for Appellee*

I further certify that on the 30th day of June, 2014, I caused the required copies of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Sicilia C. Englert
*Counsel for Appellant*
